UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
WRAP-N-PACK, INC.,

                                    Plaintiff,            **MEMORANDUM & ORDER**
                   - against -                           on Motion to Dismiss and/or
                                                         Motion for Summary Judgment
                                                         (doc. #48)
ISIDORE EISENBERG,                                       **04-cv-4887** (DRH) (JO)
LOUIS EISENBERG, and
PACKAGING METHODS DEFINED, L.L.C.,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**APPEARANCES:**

*For the Plaintiff*:

Weinberg, Gross & Pergament, LLP

400 Garden City Plaza

Garden City, NY  11530

      **By:**    **Marc A. Pergament, Esq.**

               **Marc J. Weingard, Esq.**


*For the Defendants*:

Meyer, Suozzi, English & Klein, P.C.

1501 Kellum Place

P.O. Box 803

Mineola, NY  11501-0803

      **By:**    **Erica B. Garay, Esq.**

               **Lynn M. Brown, Esq.**

**HURLEY, Senior District Judge:**

Presently before the Court is the Defendants' "Motion to Dismiss and/or Motion for Summary Judgment." Defendants move for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), and, alternatively, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes Defendants' Motion *in toto*. From the parties' Rule 56.1 Statements and the various affidavits, deposition transcripts and other documentation submitted, it appears that both Plaintiff and Defendants view Defendants' Motion as one for summary judgment. For the reasons stated below, Defendants' Motion to Dismiss is DENIED and its alternative Motion for Summary Judgment is also DENIED.

## I. BACKGROUND

The following facts are gleaned from the parties' Rule 56.1 Statements and are undisputed unless otherwise noted. In December 1987, Defendant Louis Eisenberg ("Louis") and Mitchell Cohen, co-owners of a company called Goldcrest Container ("Goldcrest"), sold certain assets of Goldcrest to Plaintiff Wrap-N-Pack, Inc. ("WNP" or "Company"). These assets included Goldcrest's interests in its telephone number, all its customer records, sales records, credit history records, vendor records, payment records, and all other records pertaining to its customers or suppliers. WNP's acquisition of Goldcrest was memorialized in an Acquisition Agreement. After the acquisition, Louis became a salesman for WNP pursuant to an employment agreement, containing, *inter alia*, a five-year covenant not to compete. Mitchell retired after the sale.

At the time of Goldcrest's sale to WNP, Louis' son, Defendant Isidore Eisenberg ("Isidore"), had been a salesman for Goldcrest for several years. Isidore also became a salesman for WNP pursuant to a 1987 employment agreement (the "Employment Agreement") containing, *inter alia*, several non-compete provisions. Specifically, Isidore's Employment Agreement provided that "during the term of this Agreement, [Isidore] shall devote full time and attention and best efforts, to the exclusion of all other businesses and ventures, to the promotion and sale of the products of [WNP]." It also contained a five-year non-compete clause (hereinafter, the "Non-Compete Provision" or "Restrictive Covenant") prohibiting Isidore from selling any products or services that were either sold or offered for sale by WNP or were similar thereto, to any person or entity that was a customer of WNP during his employment. There was no stated geographic limitation as to this restriction. In addition, Isidore's Employment Agreement required that Isidore not, at any time, disclose the names, addresses, histories of sales and re-orders, credit records, payment records, and the like, of WNP's customers.

In 1992, Louis resigned from WNP and his accounts were transferred to his son, Isidore. (When Louis and Mitchell Cohen sold Goldcrest to WNP, Louis had requested that his accounts be transferred to Isidore when he, Louis, retired from the Company.) It was at this time that the five-year covenant contained in Louis' Employment Agreement with WNP began to run. Accordingly, in 1997, Louis was no longer subject to the covenant not to compete and was free to actively compete with WNP.

In April 2003, Louis formed Defendant Packaging Methods, Defined, L.L.C. ("Pack MD"). At the time Pack MD was formed, Isidore was still employed by WNP. The parties are in substantial disagreement with respect to Isidore's involvement and participation in the formation

3

of Pack MD. Plaintiff argues that, in substance, Isidore formed Pack MD and that he used his

father, Louis, as a mere straw man to avoid the non-compete clause of his Employment

Agreement. Conversely, Defendants allege that Louis was the sole participant in the formation

of Pack MD. Specifically, they argue that Isidore was not involved in any of the transactional

aspects of the formation; that Louis was billed by the attorney who set up Pack MD; that Louis

was the registered agent for service of process; that Louis' home address was provided as the

address for Pack MD; and, that Louis was Pack MD's sole member until late summer 2003.

However, Defendants concede that Isidore was involved in a sale to a WNP customer (*i.e.*, Full

Dress Formals) on behalf of Pack MD one week before he resigned from WNP.

At approximately the same time that Pack MD was formed, Arlington Press ("AP"), a

WNP customer, contacted Louis regarding the supplying of a certain type of boxes–chip-board

boxes–it had been buying through WNP. AP had originally been a Goldcrest customer that WNP

acquired from Goldcrest. AP had been Louis' account at Goldcrest and continued to be so after

WNP's acquisition of Goldcrest. Like Louis' other accounts, the AP account was transferred to

Isidore when Louis retired; it was Isidore's largest account while at WNP. There is a dispute

whether AP contacted Louis in the summer of 2003 on its own or after the suggestion of Isidore.

However, it is undisputed that AP ceased buying its chip-board boxes from WNP and began

purchasing them through Pack MD. Yet, AP continued purchasing its corrugated boxes from

WNP for sometime thereafter until there was a disagreement between the companies over how

that business was transpiring. WNP ultimately decided to cease doing business with AP.

Isidore resigned from WNP on May 29, 2003. The parties disagree whether Isidore

promised to abide by the terms of the Non-Compete Provisions in his Employment Agreement at

that time.  In the summer of 2003, Isidore began working for Hughes Enterprises, Inc. ("Hughes") as an independent contractor.  Isidore alleges that he became co-owner of Pack MD in the late summer of 2003 because Hughes wanted to pay Isidore his commissions through a corporate entity.  Isidore's accountant allegedly suggested that he use Pack MD for this purpose rather than starting a new company.  On behalf of Hughes, Isidore sold only to Hughes' house accounts in New Jersey, not to any WNP customers.  However, Isidore began selling packaging products to AP–a WNP customer–on behalf of Pack MD in late summer 2003.

In December 2003, Isidore left Hughes and began working exclusively for Pack MD.  In mid-July 2004, WNP wrote Isidore a letter demanding he cease servicing WNP accounts.  If he failed to do so, WNP would commence legal actions against him.  Isidore did not respond to WNP's July 2003 letter; this suit followed.

The crux of WNP's suit against Isidore is that he has breached his Employment Agreement with WNP by violating its Restrictive Covenant not to compete with WNP, thereby causing damages to WNP.  On the basis of this alleged breach, WNP's Amended Complaint raises twelve causes of action.  The first eight claims are against Isidore:  breach of contract; misappropriation of trade secrets; unfair competition; breach of good faith and loyalty; diversion of corporate opportunity; accounting; tortious interference with prospective economic advantage; and unjust enrichment.  The remaining claims are against Louis and Pack MD: aiding and abetting Isidore's breach of fiduciary duty; wrongfully inducing Isidore's breach of fiduciary duty; tortiously interfering with the Employment Agreement between Isidore and WNP; and unjust enrichment.  The Defendants' position is that Isidore's Employment Agreement was superseded by an agreement dated December 19, 1991, that does not contain a non-compete

provision,[1] and, even if that is not the case, the Non-Compete Provision in the Employment

Agreement is non-enforceable under New York law as it unreasonable in duration and

geographic application.  Unsurprisingly, Plaintiff takes the position that the subject restrictive

covenant is enforceable as necessary to protect WNP's legitimate business interests in retaining

its customer base and the goodwill that it has established with its customers.

## II. DISCUSSION

### A.  Rule 12(b)(1) Standard of Review

"When presented with a Rule 12(b)(1) motion along with other motions to dismiss, the

court must decide the Rule 12(b)(1) motion first."  *Haning v. Yorktown Cent. School Dist.*, 384

F. Supp. 2d 710, 716 n.7 (S.D.N.Y. 2005) (citing *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*,

896 F.2d 674, 678 (2d Cir. 1990)).  Here, Defendants' Rule 12(b)(1) motion for dismissal for

lack of subject matter jurisdiction is based on the "amount in controversy" threshold requirement

of 28 U.S.C. §1332(a) –the so-called "diversity jurisdiction" statute that confers original

jurisdiction on district courts "of all civil actions where the matter in controversy exceeds the

---

[1] Defendants note:

> It is Defendants' position that the restrictive covenant contained in Isidore's 1987 Employment Agreement was superseded by an agreement dated December 19, 1991[,] . . . containing no such provision.  However, in light of the standards on this motion, Defendants are assuming, for the sake of argument, the 1987 agreement, on which Plaintiff has sued and which contains the non-compete, applies.  Defendants reserve their right to contend at trial that the con-compete is inapplicable.

Defs.' Mem. Supp. Summ. J. at 9 n.3.

sum or value of $75,000, exclusive of interest and costs" and that is between diverse parties, *see*

§ 1322(a)(1)-(4).  Defendants argue:

> [that t]o the extent that the claims that remain *after the Court's decision on this motion* are based solely upon lost profits and/or compensation paid to Isidore Eisenberg from April-May 2003, or upon the profits or sales of Pack MD in that period, such damages are less than $75,000 and therefore, this Court can find "to a legal certainty" that it does not have subject matter jurisdiction over such claims and dismiss this action.

(Defs.' Mem. Supp. Summ. J. at 23. (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303

U.S. 283, 289-90 (1983); *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 362

(2d Cir. 2005).)  However, the *Red Cab* court stated, *inter alia*:

> The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts.  The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, *the sum claimed by the plaintiff controls if the claim is apparently made in good faith*.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.  *The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction.* Nor does the fact that the complaint discloses the existence of a valid defense to the claim.  But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore [not][2] colorable for the purpose of conferring jurisdiction, the suit will be dismissed. *Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.*

---

[2] The Court presumes that, due to a scribner's error, the word "not" was inadvertently deleted from the text.

303 U.S. 283, 289-90 (emphasis added). Indeed, as the Second Circuit instructs, "we measure the amount in controversy *as of the date of the complaint*. Once jurisdiction has attached, it cannot be ousted by subsequent events." *Scherer v. Equitable Life Assur. Soc'y, U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (citing *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)) (emphasis added). The party invoking federal court jurisdiction "has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *Id.* (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (further citation omitted)). But, that burden is "hardly onerous . . . [given the] rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Id.* If a party opposes diversity jurisdiction, then that party "must show 'to a legal certainty' that the amount recoverable does not meet the jurisdictional threshold." *Id.* (quoting *Wolde-Meskel*, 166 F.3d at 63 (further citation omitted)).

> Our cases have set a high bar for overcoming this presumption. The legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim. Even where the allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.

*Id.* (internal quotations, citations, and brackets omitted).

Thus, Defendants are presented with a heavy burden to shoulder in convincing the Court that it lacks subject matter jurisdiction in this instance. Here, Defendants cannot shoulder that burden. First, the Defendants would have the Court dismiss Plaintiff's action for lack of subject matter jurisdiction *after* it makes its decision on the present "Motion to Dismiss and/or Motion

for Summary Judgment." The Court cannot do that; it is required to make its determination of subject matter jurisdiction as of the date of Plaintiff's filing its complaint.

Second, while it is true that one of Plaintiff's own interrogatory answers[3] admit that certain of its damages are below the $75,000 jurisdictional limit, (*see* Defs.' Mem. Supp. Summ. J. at 23 (citing Pl.'s Resp. to Defs.' 2d Interrogs. (Ex. 25) at No. 10 (p.6)), another of its answers shows that Plaintiff's assertion of an amount in controversy exceeding $75,000 was one made in good faith. (*See, e.g., id.* at No. 25 (p.13) ("WNP has been damaged by a loss of net profits in the sum of no less than $584,287.78").) In sum, upon the record before the Court, the Defendants have not overcome the highly set bar of presumption that Plaintiff's allegation of amount in controversy exceeding $75,000 is one made in good faith and one that represents the actual amount in controversy. Rather, the Court has subject matter jurisdiction over Plaintiff's action; as such, Defendants' Motion to Dismiss pursuant to rule 12(b)91) is denied.

### B. Treatment of a Rule 12(b)(6) Motion as one for Summary Judgment

Rule 12(b) contemplates the conversion of a motion to dismiss for failure to state a claim upon which relief can be granted, *i.e.*, a Rule 12(b)(6) motion, to one for summary judgment under certain circumstances; the Rule states:

> *If*, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment* and disposed of as provided in Rule 56, and all

---

[3] On a Rule 12(b)(1) motion to dismiss, "a court may properly refer to evidence beyond the pleadings to resolve disputed jurisdictional facts." *Haning*, 384 F. Supp. 2d at 717 (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

> parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b) (emphasis added).  Determining whether the conversion of a Rule 12(b)(6) motion to a motion for summary judgment is proper largely depends on the facts and circumstances of each case.  *See, e.g., Krijn v. Pogue Simone real Estate Co.*, 896 F.2d 687, 690 (2d Cir. 1990) (quoting *Nat'l Ass'n Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 911 (2d Cir. 1988)).

In this instance, Defendants moved in the alternative for summary judgment.  Indeed, a review of the papers filed in connection with Defendants' Motion to Dismiss–both in support of and in opposition thereto–demonstrate that Defendants' arguments for dismissal were treated in a cursory manner at best.  Conversely, both parties present detailed arguments in their memoranda addressing summary judgment–both for and against it.  For all intents and purposes, Defendants' moving papers and Plaintiff's opposition papers are more properly viewed as those on a motion for summary judgment.  Furthermore, the docket clearly establishes that both parties have filed Rule 56.1 Statements, various affidavits, deposition transcripts, as well as other documentation–items a court is to consider on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c) and (e).  (*See also* Defs.' Notice of Mot. (doc. #48) (requesting notice  "upon the annexed Statement of Material Facts submitted pursuant to Rule 56.1" that Defendants "will move this Court pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and 56(b) . . .").)  The conduct of the parties in this instance convinces the Court that the parties have been afforded a reasonable opportunity to present all materials pertinent to a summary judgment motion and that conversion of Defendants' Rule 12(b)(6) dismissal motion will not come as a

surprise to any party. *See, e.g.*, *Nat'l Ass'n Pharm. Mfrs.*, 850 F.2d at 911 (discussing factors a court may consider in determining whether sufficient notice has been provided to a non-movant of a conversion of a Rule 12(b)(6) motion to one for summary judgment). Therefore, the Court shall treat Defendants' Rule 12(b)(6) dismissal motion as one for summary judgment.

### C. Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-moving party, that no rational jury could find in favor of the non-moving party. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, and/or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of

evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, *N.Y.*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Id.* (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.* 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the court in its determination of the summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party

will ultimately bear the burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence supporting an essential element of the non-movant's claim. *See id.* at 210-11. In such an instance, in order to defend against the motion for summary judge, the non-movant must offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). And, in deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

### D. The Instant Case: The Enforceability of the Restrictive Covenant

WNP's suit rises or falls with the determination of the enforceability of the Restrictive Covenant found in Isidore's Employment Agreement. Under New York law, a restrictive covenant is reasonable–and, therefore, enforceable– if it "'(1) is no greater than is required for the protection of a legitimate interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public.'" *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 276(E.D.N.Y. 2002 (Wexler, J.) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999)).

#### (1)(a)  *No Greater than is Required*

Defendant Isidore argue that, assuming his Employment Agreement is enforceable, the Non-Compete Provision is greater than is necessary both as to duration and geographic scope. (*See* Defs.' Mem. Supp. Summ. J. at 5.) Indeed, "WNP used much narrower restrictive covenants for its other salesmen and transferred accounts, which were limited to two years and to

customers actually serviced by the salesmen during the last two years of his employ, or to specific accounts." (*Id.*)

Citing a 1961 New York case, *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.*, 13 A.D. 2d 27, 30, 231 N.Y.S.2d 577, 580 (1st Dep't 1961), WNP conclusively asserts "the 5-year restriction is not overbroad." (Pl.'s Mem. Opp'n at 10.) It then proceeds to inform the Court of its power to "blue pencil" the Non-Compete Provision, modifying its duration and geographic scope in order to protect WNP's legitimate interest. (*Id.* (citing *Unisource*, 196 F. Supp. 2d at 277; *S. Nassau Control Corp. v. Innovative Control Mgmt. Corp.*, No. 95-cv-3724, 1996 WL 496610, at *5 (E.D.N.Y. 1996) (Hurley, J.); *Bijan Designer for Men, Inc. v. Katzman*, No. 96-cv-7345 (BSJ), 1997 WL 65717, *5 n.8 (S.D.N.Y. 1997)).

First, the Court takes special note of the *Unisource* court's finding that a two-year duration for the restrictive covenant at issue was reasonable. The Court makes this notation because WNP relies heavily upon *Unisource* (*see id.* at 5-10); indeed, it is the Company's position that "[i]n most critical respects, the facts in this case are indistinguishable from the facts in *Unisource*." (*Id.* at 9-10 (listing 11 examples of "indistinguishable facts" between the instant case and the *Unisource* case).) However, the *Unisource* court made this finding in the context of a request for injunctive relief, *see Unisource*, 196 F. Supp. 2d at 272, which has a different standard than the standard used in determining a motion for summary judgment. In the context of a motion for summary judgment, the court's role is "'not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Ivy Mar Co.,*

*Inc. v. C.R. Seasons Ltd.*, No. 95-cv-0508 (FB), 1998 WL 704112, at *4 (E.D.N.Y. 1998) (Block, J.) (quoting *Anderson*, 477 U.S. 242, 249 (1986)). Thus, while a court has the discretion to pare or "blue pencil" a restrictive covenant as to its duration and geographic scope in the context of granting injunctive relief, *see, e.g., S. Nassau*, 1996 WL 496610, at *5 and n.2; *see also Webcraft Techs. Inc. v. McCaw*, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987) ("In appropriate circumstances, courts may 'blue pencil' an overbroad restrictive covenant to enforce only its reasonable provisions."), the same is not true in other contexts. *See S. Nassau*, 1996 WL 496610, at *5 n.2 ("[T]he paring of the covenant . . . is made solely for present [injunctive relief] purposes and *is subject to alteration* depending upon any additional information adduced at trial." (emphasis added)). The question of reasonableness is one of fact. *See, e.g., BDO*, 93 N.Y.2d 382, 390 (1999) ("[T]he application of the test of reasonableness of employee restrictive covenants focuses on the particular facts and circumstances giving context to the agreement." (relying on *Kaprinski v. Ingrasci*, 28 N.Y.2d 45, 49 (1971), *and* citing *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976)).

On the record presented, the Court finds insufficient evidence to make a determine as a matter of law as to the reasonableness of the subject Non-Compete Provision in Isidore's Employment Agreement; rather, a factual inquiry is necessary to determine the Provision's reasonableness and, if necessary, the degree of paring required to make it reasonable. Therefore, the granting of summary judgment on this issue is inappropriate. The Court notes that since discretion to pare a restrictive covenant lies with the Court, by parity of reasoning, the Court is the one to serve as the fact finder on this issue of reasonableness. The Court will make this determination during the course of the trial in this case, which, given the present circumstances,

shall be accelerated. (*See* "Conclusion" for scheduling of pre-trial conference.)

(1)(b)  *Legitimate Interest*

As to the "legitimate interest" portion of the first prong of the *BDO* test, "an employer

may assert only four types of 'legitimate interests'," *Silipos, Inc. v. D. Bickel*, No. 05-cv-4356

(RCC), 2006 WL 2265055, at *3 (S.D.N.Y. 2006): "(1) protection of trade secrets; (2) protection

of confidential customer information; (3) protection of an employer's client base; and (4)

protection against irreparable harm where an employee's services are unique or extraordinary,"

*id.* (citing *BDO*, 712 N.E.2d at 1224-25).

In turn, "[a] trade secret may consist of any formula, pattern, device *or compilation of*

*information* which is used in one's business, and which gives him an opportunity to obtain an

advantage over competitors who do not know or use it." *Integrated Cash Mgmt. Servs., Inc. v.*

*Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (emphasis added) (quoted with

approval in *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 126

(E.D.N.Y. 1997) (Seybert, J.)).  Thus, contrary to Defendants' contention otherwise (*see* Defs.'

Mem. Supp. Summ J. at 12), "'[a] customer list developed by a business through substantial

effort and kept in confidence *may* be treated as a trade secret and protected at the owner's

instance against disclosure to a competitor, *provided* the information it contains is not otherwise

readily ascertainable.'"  *N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)

(quoting *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.),

*cert denied*, 474 U.S. 844 (1985)) (emphasis added); *see also Ikon Office Solutions, Inc. v.*

*Leichtnam*, No. 02-cv-0721, 2003 WL 251954, at *2 n.9 (W.D.N.Y. Jan. 3, 2003) ("For example,

personal contracts and spending habits of publicly known entities may nonetheless represent information that is not readily available from a public source of information." (citing *Props for Today, Inc. v. Kaplan*, 558 N.Y.2d 38, 39 (1st Dep't 1990) (holding that customer lists containing publicly known entities may nonetheless contain non-public information))); *Bijan*, 1997 WL 65717, at *6 (noting that courts have equated customers' "buying habits, requirements and preferences with 'difficult to obtain information'"). The *Unisource* court stated that "[t]he 'readily ascertainable' standard does not apply in cases where . . . an agreement expressly prohibits disclosure of customer lists." 196 F. Supp. 2d at 279 (citing *Haber*, 188 F.3d at 47).

In determining whether information constituted a trade secret, the *Unisource* court relied on the factors considered by New York courts:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 278 (citing *Haber*, 188 F.3d at 44 (further citing, *inter alia*, Restatement of Torts § 757 cmt. b)).

Here, WNP has presented evidence that controverts Defendants' claim that WNP's customer information is not a trade secret. Indeed, that evidence demonstrates that WNP's customer information (or list) was developed through substantial effort and kept in confidence. First, WNP paid Goldcrest in excess of $300,000 for the acquisition of Goldcrest's business, including the "right, title and interest in all customer records, sales records, credit history records,

17

vendor records, payment records, and all other records" of Goldcrest. ("Bill of Sale" between Goldcrest and WNP (Dec. 29, 1987), Ex. 4, attached to Defs.' Notice of Mot.; *see also* Aff. Shelly Weinberg ("Weinberg") at ¶¶ 3, 21, 23 (and cites referenced in each ¶), attached to Pl.'s Rule 56.1 Counterstatement.) Second, according to Weinberg, WNP implemented significant safeguards to protect its customer information. For example: (1) access to WNP's computer system required a user identification and password (*see* Weinberg Aff. at ¶ 43(1)); (2) the Company installed passwords, firewalls and security software on its computer system that prevented salesmen from accessing any information regarding other salesmen's customers (*see id.* at ¶ 43(2)); (3) the Company installed passwords and restrictions on all laptop computers to limit access to authorized customer information (*see id.* at ¶ 43(3)); (4) it required salesmen to execute restrictive covenants for all transferred accounts (*see id.* at ¶ 43(4)); (5) WNP distributed an employee policy-and-procedure manual to all employees that contained a code of conduct defining unacceptable behavior to include disclosing confidential information about its customers to competitors and others (*see id.* at ¶ 43(5)); (6) WNP pursued legal avenues, including litigation, to prevent the threatened disclosure of confidential information (*see id.* at ¶ 43(6)); (7) the Company reminded salesmen of their duty and obligation to maintain customer confidentiality via office memoranda (*see id.* at ¶ 43(7)); (8) it provided oral and written notice to salesmen at the end of their employment with the Company of their duty and obligation to maintain customer confidentiality (*see id.* at ¶ 43(8)); and (9) WNP disabled salesmen's access to customer information on laptop computers upon termination of employment (*see id.* at ¶ 43(9)). Third, by the terms of his Employment Agreement, Isidore was expressly prohibited from disclosing WNP's customer information. The Employment Agreement stated, *inter alia*:

(b)  The Executive [*i.e.*, Isidore] recognizes and acknowledges that *the names, addresses, histories of sales and reorders, credit payment records of customers of the Corporation and its Affiliates*, suppliers lists, formulae, trade secrets, employee names and proprietary processes of the Corporation and its Affiliates, as they exist from time to time, *are valuable, special and unique assets of the business of the Corporation and its Affiliates*, access to and knowledge of which are essential to the performance of the Executive's duties during his employment by the Corporation.  *The Executive will not, during or after the Covenant Term, in whole or in part, disclose such names, addresses, histories of sales and reorders, credit, payment records of customers of the Corporation or its Affiliates*, other lists, employee names, formulae, secrets or processes, *to any person, firm, corporation, or other entity for any reason or purpose whatsoever, nor shall the Executive make use of any such information and property for his own purposes or for the benefit of any person, firm, corporation or other entity* (except the Corporation or its Affiliates at their specific request in each instance) *under any circumstances during or after the Covenant Term*.

(Employment Agreement at ¶ 9, Ex. 5, attached to Defs.' Notice of Mot. (doc. #48) (emphasis added).)  These factors, at least on the information provided, convince the Court that WNP's customer information is not the compilation of information that is readily accessible to the public.  Rather, under the rubric of applicable case law, it appears to have acquired the status of trade secret warranting protection from disclosure.  Therefore, the Court rejects Defendants' contention that, as a matter of law, the subject information cannot be characterized as trade secrets.

       (2)    *Undue Hardship on the Employee*

Other than in the context of the overbreadth of the Restrictive Covenant, Defendants do not advance any arguments of undue hardship.  Indeed, neither does the Plaintiff address this

component of the enforcement analysis in an independent manner. Yet, as the *BDO* court indicated, the test for reasonableness of an employment restrictive covenant under New York law is a "tripartite test." *See* 93 N.Y.2d at 393 (analyzing whether a restrictive covenant would work an undue hardship on a former employee). Therefore, in determining reasonableness, the Court is to make an independent finding as to whether the Restrictive Covenant imposes an undue hardship on Isidore.

The Court is cognizant that its determination on the reasonableness of the duration and geographic scope of the Restrictive Covenant overlaps with a determination whether the Restrictive Covenant imposes an undue hardship. Therefore, the undue hardship determination will not be made at this time. The parties will be permitted to present evidence and make arguments supporting their respective positions on this second prong of the restrictive covenant reasonable test at trial.

(3)     *Not Injurious to the Public*

There is neither evidence nor argument before the Court regarding the final prong of the restrictive covenant reasonable test, *i.e.*, whether or not the restrictive covenant is injurious to the public. This, in turns stymies the Court's ability to complete its overall determination. *Cf., e.g., BDO*, 93 N.Y.2d at 393-94 (analyzing the restrictive covenant under the "injury to public" prong of New York's tripartite restrictive covenant reasonable test to complete its determination). Thus, even if the Court could make all other necessary determinations as a matter of law (which, as stated above, it cannot in this instance), the Court is precluded from granting summary judgment because it is missing evidence which is necessary for a determination as a matter of

law.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (doc. #48) is DENIED and their alternative Motion for Summary Judgment (also doc. #48) is DENIED.

The parties shall appear before the Court on **Wednesday, April 18, 2007, at 2:00 P.M.**, at the Federal Courthouse in Central Islip, New York, in Courtroom 930, for a pre-trial conference. Should that conference not result in a settlement, the case shall be scheduled for trial shortly thereafter.

      **SO ORDERED**.

Dated: Central Islip, New York                 _____/s/_____
       March 29, 2007                         Denis R. Hurley,
                                           United States Senior District Judge